UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT ANNABEL,

                  Plaintiff,                        No. 14-10244

v.                                                  District Judge Arthur J. Tarnow
                                                    Magistrate Judge R. Steven Whalen

JACK FROST, ET AL.,

                  Defendants.
_____/

## REPORT AND RECOMMENDATION

On January 17, 2014, Plaintiff Robert Annabel ("Plaintiff"), a prison inmate in the custody of the Michigan Department of Corrections ("MDOC"), filed a *pro se* civil complaint under 42 U.S.C. § 1983 [Doc. #1].  Before the Court is Plaintiff's motion for summary judgment [Doc. #210] and Defendants Sherman Campbell, James Eaton, Jack Frost, Steven Kindinger, and Keith McConnell's ("Defendants") motion for summary judgment [Doc. #211], filed respectively on January 3 and January 4, 2019.  These motions has been referred for Reports and Recommendations under 28 U.S.C. § 636(b)(1)(B).  For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Doc. #211] be GRANTED and that Plaintiff's Motion for Summary Judgment [Doc. #210] be DENIED.

-1-

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Plaintiff's Allegations

At the time of the alleged incidents giving rise to the complaint, Plaintiff was incarcerated at the Gus Harrison Correctional Facility. *Amended Complaint, Docket #18,* filed April 8, 2014.  On July 1, 2013, he asked Assistant Resident Unit Manager ("ARUM") Steven Kindinger ("Kindinger") to post a sign-up sheet for inmates seeking to obtain a position as unit representative.  Kindinger told him, "I don't want you as block rep." *Id*, ¶ IV-1.  Because Kindinger had still not posted a sign-up sheet by July 12, 2013, Plaintiff filed a grievance on July 17, 2013. *Id*. ¶ IV-3. Defendants James Eaton ("Eaton"), Grievance Coordinator and Sherman Campbell ("Campbell"), Deputy Warden rejected the grievance and, Plaintiff alleges, he notified Defendants Kindinger and Jack Frost ("Frost"), a Corrections Officer, that Plaintiff had written a grievance and should be disqualified from a unit representative position. *Id*. ¶ IV-4-5.

On July 22, 2013, Plaintiff opened the tray slot in prisoner McQuitter's cell and delivered a folded t-shirt to McQuitter. *Id*. ¶ IV-8. Defendant Frost then walked toward Plaintiff and said, "You're in trouble, go lock up." *Id*. ¶ IV-9. Frost wrote a Class II misconduct ticket against Plaintiff for disobeying a direct order. *Id*. ¶ 10. Plaintiff alleges that "Frost would not have written a Class II misconduct for disobeying a direct order if Plaintiff hadn't pressed the issue about a unit representative position with his superiors and then filed a grievance." *Id*. ¶ IV-12.

At the misconduct hearing on August 4, 2013, Plaintiff admitted to opening McQuitter's tray slot, but denied that Frost had ever given him a direct order to not pass items to another prisoner. Plaintiff states that Captain Keith McConnell ("McConnell"), who conducted the hearing, "falsely claimed in a hearings report that Plaintiff admitted disobeying a direct order." *Id*. ¶¶ IV-17-20. He also alleges that in the August 6, 2013 hearings report, McConnell "acknowledged that Plaintiff said the incident could not have occurred at 1620 hrs., as stated on the misconduct report and changed the time to 'approximately 1830 hours'...." *Id*. ¶ IV-20. Following the misconduct report, Plaintiff, who had won election as unit representative, was removed from that position. *Id*. ¶¶ IV-19, 21.

Plaintiff brings the following claims:

(1) That all Defendants retaliated against him, in violation of his First Amendment right to file a grievance and "for his exercise of the right to freedom of speech on behalf of himself and other prisoners."

(2) That Defendant Frost violated substantive due process by issuing a false misconduct charge.

(3) That Defendant McConnell violated procedural due process at the misconduct hearing.

(4) That Defendant Campbell violated due process by upholding McConnell's "false and unsupported findings." *Id.* ¶¶ V -1-4.

Plaintiff requests monetary damages, attorney fees, and costs against all five Defendants. *Id.* ¶¶ VI-a-j.

## B. Procedural History

On January 22, 2016, the District Court adopted the undersigned's recommendation to dismiss the action in its entirety under Fed. R. Civ. P. 12(b)(6) and entered judgment in favor of Defendants. *Docket #28, 38, 59-60.*   On September 21, 2016, the Sixth Circuit vacated the dismissal of the First Amendment retaliation claim but affirmed the dismissal of the procedural and substantive due process claims. *Annabel v. Frost,* Case No. 15-1518, 4 (6th Cir. Sept. 21, 2016)(unpublished) *Docket #63.*  As to the retaliation claims, the Court held that Plaintiff's allegation that the Class II misconduct conviction remained on file, increased classification points, interfered with point reduction, affect parole decisions, and disqualified him from "unit representative positions" sufficiently pled an "adverse action" to "proceed past the pleading stage." *Docket #63,* 4 (*citing Hill v. Hoffner,* 2016 WL 1165405, at *6 (W.D. Mich. March 25, 2016))(issuance of Class II misconduct charge states an "adverse action"for pleading purposes).[1]

As to the requirement of alleging a correlation between the protected conduct and adverse action, the Sixth Circuit noted:

> Annabel alleged that Defendants Eaton and Campbell told Kindinger and Frost that Annabel should be disqualified from a unit representative position because he filed a grievance. He also alleged that Frost wrote a false misconduct ticket for another prisoner who was 'pressing the issue of a unit representative el[e]ction as an intended candidate' in order to disqualify him for the position.

---

[1]

However, the Court observed elsewhere that aside from the termination from the unit representative position, Plaintiff "did not allege any facts concerning the nature of the penalty he received as a result of the [misconduct] charge." *Docket #63* at 6.

-4-

These allegations, coupled with the temporal proximity between Annabel's grievance and the misconduct charge [five days], sufficiently stated a plausible First Amendment retaliation claim. *Docket #63,* 5.

## III. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990). Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6ᵗʰ Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added). If the non-moving party cannot meet that burden, summary judgment is proper. *Celotex Corp.*, 477 U.S. at 322-23. "[O]n cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (C.A.6 (Ohio),2001)(*citing Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991).

## IV. ANALYSIS

### A. Plaintiff's Motion for Summary Judgment

In his remaining retaliation claim, Plaintiff argues, in effect, that he has shown as a matter of law that Defendants' actions meet all the elements for a retaliation claim. *Docket #210.* Under *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999), a retaliation claim has three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to

-6-

engage in that conduct; and (3) there is a causal connection between elements one and two–that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."  Because Plaintiff bears the ultimate burden of proof, he faces a "significantly higher hurdle" in showing that he is entitled to summary judgment.  *Horton v. Greene*, 2019 WL 1552480, at \*2 (E.D.Mich. April 10,  2019)(*citing Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002)("if the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it")(internal citations omitted).

The first two elements of the retaliation are not in dispute.  The filing of the July 17, 2013 grievance constitutes a protected activity.  *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000)(inmate has an undisputed First Amendment right to file [non-frivolous] grievances against prison officials on his own behalf").  Likewise, the Class II conviction on the misconduct charge resulting in Plaintiff's disqualification from the unit representative position satisfies the "adverse action" element of the retaliation claim.  *See Annabel v. Frost,* Case No. 15-1518, 4 (6th Cir. Sept. 21, 2016)(unpublished), *Docket #63.*

 At the third prong, the Sixth Circuit held that Plaintiff's allegations that "Defendants Eaton and Campbell told Kindinger and Frost that Annabel should be disqualified from a unit representative position because he filed a grievance;" allegations that Frost wrote a false misconduct ticket for another inmate seeking election as a unit representative; and the

temporal proximity of his grievance to the misconduct ticket "stated a plausible first Amendment retaliation claim." *Id.* at 5. Thus, the Plaintiff avoided a Rule 12(b)(6) dismissal under the plausibility standard of *Ashcrof v. Iqbal*, 556 U.S. 662 (2009). However, Plaintiff cannot show as a matter of law that he is entitled to summary judgment - even assuming that he was not subject to the heightened standard for summary judgment required for a party with ultimate burden of proof at trial. *Arnett*, *supra*, 281 F.3d at 561.

### 1. Defendant Frost

As to the July 22, 2013 opening of the food slot to McQuitter's cell and delivering a folded t-shirt, Plaintiff concedes that his actions constituted a Class II violation of the housing unit rules but contends that Frost falsely charged him with the more serious Class II violation of disobeying a direct order. *Docket #21,* 20 of 100, Pg ID 2350. Plaintiff alleges further that although prior to opening McQuitter's cell Frost observed Plaintiff open another prisoner's food slot to retrieve an item, Frost did not confront Plaintiff but instead "secretly followed him to the very far end of C-wing [where McQuitter's cell was located] to confront him away from the rotating [security] camera." *Docket #210,* pg. 20-21 of 100. Plaintiff also points out that the time of the alleged misconduct (16:42 hrs.) was during a time when prisoners were typically confined to their cells and that Frost deliberately misstated the time of the misconduct ticket to "throw off the correct video reviewing time by nearly two hours." *Id.* at 9 of 100.

Plaintiff's purported factual scenario related to the misconduct ticket in retaliation for

filing a grievance does not uniformly support his claim.  Plaintiff claims that Frost deliberately confronted him outside of range of  security cameras and falsified the time of incident to prevent Plaintiff from obtaining exculpatory video evidence.  However, Plaintiff admits that misconduct at issue occurred outside of McQuitter's cell.  The fact that the area outside of McQuitter's cell was (allegedly) not easily observable is immaterial given that location of the confrontation and misconduct (whether Class II or III) was dictated by Plaintiff's own  errand to McQuitter's cell.   The claim that Frost deliberately waited until he arrived at a location outside the security camera scope stands at odds with Plaintiff's acknowledgment that he was in the process of delivering an item to McQuitter's cell.

Moreover, Plaintiff's claim that the prisoners would have been confined to their cells at the time stated on misconduct ticket is contradicted by Defendant McConnell's statement that at the time of the misconduct, prisoners were not always restricted to their cells, but rather that prisoners would be released for meals any time after the results of the prisoner count was "submitted to control center." *McConnell Interrog. Resp.,* Pg ID 2492.  Moreover, contrary to Plaintiff's claim that Frost issued no commands prior to the delivery of the t-shirt, Frost testified that he issued several verbal commands to Plaintiff not to pass the disputed item to McQuitter and that Plaintiff ignored the commands.  *Frost Dep,* Pg ID 2627-2628. Frost denies that ARUM Kindinger ever spoke with him about not wanting Plaintiff as unit representative and has stated that he was not influenced with any conversation with Kindinger about Plaintiff's role as "acting" unit representative before issuing the misconduct

ticket. *Frost Dep.,* Pg ID 2629.  Plaintiff acknowledges that he had "no prior conflicts" with

Frost.   *Docket #210,* Pg ID 2349.   While Plaintiff alleges that Kindinger "had officer

seniority" over Frost, he offers no support for his conjecture that Frost issued the Class II

misconduct at Kindinger's request.[2]

The Court also considers the Sixth Circuit's finding that the retaliation claim was

supported by Plaintiff's allegation that inmate Tareen Gray (who was pursuing a parallel unit

representative position) received a misconduct ticket from Frost on July 28, 2013, *Amended

Complaint* at IV ¶ 16; *Docket #63,* 5.  However, Plaintiff's deposition testimony that Gray

"did not grieve the issue of the [unit] rep" defeats his allegation that Gray's misconduct ticket

(given the absence of "protected activity" by Gray) was issued by Frost in retaliation for

Gray's assertion of his First Amendment rights.  *Docket #210,* pg. 37 of 100, Pg ID 2367.

While Plaintiff testified that Gray "left it up to [Plaintiff] to [file the grievance]" neither

Plaintiff's Step I or Step II grievance statements mention Gray.  *Id.* at pg. 63, 65 of 100, Pg

ID 2393.  Notably at Step II, Plaintiff clarifies that the grievance does not pertain to his entire

---

[2]

Although Plaintiff asserts that the issuance of a Class II misconduct instead of the less serious Class III charge was made in retaliation for filing a grievance, he acknowledges receiving both Class II and/or the more serious Class I misconduct tickets within months of the misconduct at issue and that over the course of his tenure with the MDOC he received approximately 300 misconduct tickets.  *Docket #210,* pg 46 of 100, Pg ID 2376.   He acknowledges that he was ineligible for the unit representative position as of his July 1, 2013 discussion with Kindinger and that he would not complete the six-month period without a Class I or Class II misconduct until July 4, 2013.  *Docket #210* at 7 of 100, Pg. ID 2337.

housing unit or "any other prisoner," but only himself.  *Id.* at 65.

## 2. Defendant Kindinger

Kindinger's alleged statement that he did not want Plaintiff to be the unit representative, coupled with the ensuing grievance and misconduct ticket, does not entitle Plaintiff to judgment as a matter of law.   Plaintiff alleges in his amended complaint and present motion that on July 1, 2013, Kindinger stated that he did not want Plaintiff to be unit representative.  *Amended Complaint,* IV. ¶ 1, *Docket #210,*pg 7 of 100, Pg ID 2337. However, Plaintiff testified at his deposition that the initial conversation regarding the unit representative position occurred on July 12, 2013.  *Id.* at 34.  He states that Kindinger "kind of played it off sort of - sort of like it was kind of an arrogant joke or something like that," and that while Kindinger's manner was "covered with niceties like he was just joking . . . he . . . refused to post the sheet so he was serious" *Id.*  Plaintiff testified that his "impression was that [Kindinger] did not want me to be his block rep but he was kind of trying to play it off like it was good humor . . . where somebody frames good nature but there's an underlying message that it's not going to happen." *Id.*  However, it is unclear from Plaintiff's testimony whether Kindinger actually stated that he would not begin the election process and that he did not want Plaintiff to be the unit representative, or Plaintiff simply inferred that Kindinger's failure to post the sheet pertaining to the unit representative election constituted a "refusal."   Plaintiff's "impression" that Kindinger did not want him to be unit representative, coupled with his belief that the failure to post the election sheet within the

five days between the July 12, 2013 conversation and the grievance, is a far cry from the original allegation that Kindinger stated "I don't want you as block rep." *Amended Complaint,* IV. ¶ 1.

Plaintiff's belief that Kindinger did not want him to be unit representative and later directed Frost to issue a misconduct ticket in retaliation for the July 17, 2013 grievance is contradicted Kindinger's denial that he directed Frost to issue a misconduct ticket to Plaintiff *Defendants' Exhibit J,* Pg ID 2622-3, ¶¶ 7-8.  Kindinger also states that he would not have learned of the July 17, 2013 grievance until three days after the July 22, 2013 misconduct ticket was issued.  *Id.*  Notwithstanding the temporal connection between the grievance and the issuance of the misconduct ticket, Plaintiff has not provided more than conjecture to support his claims against Kindinger.  Even assuming that Plaintiff could show that Kindinger did not want him to be unit representative, he has not shown that Kindinger had a hand in a subsequent misconduct ticket, *i. e.,* the "adverse action" required to meet the third prong of a retaliation claim.  While, as discussed above, the temporal connection between the grievance, coupled with his claim that Kindinger did not want him to be unit representative, states a *plausible* allegation of retaliation for pleading purposes, Plaintiff has not established as a matter of law that Kindinger was involved in the issuance of the misconduct ticket.  *See Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001)(temporal proximity between the filing of grievances and transfer supported by only limited circumstantial support insufficient to show that the protected activity was motivating factor

for transfer).

### 3. Defendants Eaton and Campbell

Plaintiff is not entitled to judgment against Eaton, a grievance coordinator or Deputy Warden Campbell.  Defendant Eaton stated that he did not engage in discussion regarding Plaintiff's grievances with any other Defendant. *Defendants' Exhibit D*, ¶ 8, Pg ID 2571. Plaintiff has not shown that Eaton's involvement extended beyond processing the Step I grievance or what Eaton's possible motive would have been directing Frost to issue a misconduct ticket.   Contrary to Plaintiff's belief that Campbell directed Kindinger to bar Plaintiff from becoming a unit representative, Campbell denies that he told Defendant Kindinger or any other Defendant that Plaintiff ought to be barred from the position of unit representative. *Defendants' Exhibit M,* Pg ID 2645.  The fact that Eaton and Campbell denied Plaintiff's grievance, with nothing more, does not establish liability for the First Amendment retaliation claim.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)(no liability under § 1983 where Defendants' "only roles . . . involve the denial of administrative grievances").  While  Campbell also upheld Defendant McConnell's finding of guilt on the Class II misconduct charge, he denies the allegation that he told others to bar Plaintiff from the position of unit representative or had any personal involvement in the allegedly unconstitutional issuance of a Class II misconduct ticket.  *Docket #211-6,* Pg ID 2583-84.

### 4. Defendant McConnell

As to Captain McConnell, who presided as hearing officer at the misconduct hearing,

Plaintiff has also failed to establish a causal connection between his protected conduct and the guilty finding on the Class II misconduct charge.   First, Plaintiff concedes that McConnell's involvement was limited to overseeing the misconduct hearing.  *Defendants' Exhibit B,* Pg ID 2560.  Plaintiff's concession is consistent with McConnell's testimony that he never spoke with Kindinger about Plaintiff's desire to be a unit representative, that he did not state at any time that Plaintiff should be disqualified from the post, and that he had no opinion as to whether Plaintiff ought to have been a unit representative.  *Defendants' Exhibit I,* Pg ID 2618. Even assuming that McConnell erroneously believed Frost's account of the misconduct, Plaintiff has not shown that McConnell was complicit in the allegedly retaliatory activity.[3]

Accordingly, I recommend that Plaintiff's motion for summary judgment be denied.

## B.  Defendants' Motion for Summary Judgment

Defendants argue that they entitled to judgment as a matter of law because Plaintiff has failed to establish a causal connection between the grievance regarding the unit representative position and the Class II misconduct ticket.  *Docket #211,* 12-24, Pg ID 2524. Defendants argue that Plaintiff's "theories" of how they violated his First Amendment rights are unsupported by any evidence of  retaliatory animus by any of the individual Defendants. *Id.* at 12-13.

---

[3]

While Defendants also argue in response to the Plaintiff's motion that the claims against McConnell were not properly exhausted, the Court will address the exhaustion issue in discussing Defendants' motion for summary judgment.  *See below.*

The temporal proximity of five days between the filing of the grievance and the misconduct ticket, standing alone, can in some cases create the inference of retaliation. "'[R]etaliation rarely can be supported with direct evidence of intent. That is why circumstantial evidence, like the timing of events . . . is appropriate to consider when [assessing a retaliation claim].'" *Brockman v. McCullick*, 2018 WL 3207902, at *5 (E.D.Mich. July 29, 2018)(Roberts, J.)(*citing Carter v. Dolce*, 647 F. Supp. 2d 826, 835 (E.D. Mich. 2009)). "Indeed, 'temporal proximity alone may be significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'" *Id.* (*citing Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004)(internal citations omitted); *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir.2005). Notwithstanding the temporal proximity of the protected conduct and adverse action, however, "the defendant may still avoid liability by showing 'that he would have taken the same action in the absence of the protected activity.'" *Whiteside v. Parrish*, 387 Fed.Appx. 608, 612, 2010 WL 2842746, at *4 (6th Cir. July 21, 2010)(*citing Thaddeus-X* at 399). Where a defendant can show non-retaliatory motives for his actions, "summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant."*Wenk v. O'Reilly*, 783 F.3d 585, 594 (6th Cir. 2015)(*citing Dye v. Office of the Racing Commission*, 702 F.3d 286, 294-295)(6th Cir.2012)).

Here, Defendants have a greater burden to show that they are entitled to summary judgment than in simply denying Plaintiff's motion summary judgment. The reasons for

-15-

denying Plaintiff's motion, discussed in detail above and the additional reasons set forth below, support Defendants motion for judgment as a matter of law.

### 1. Defendant Kindinger

Kindinger, ARUM at Unit 4 of ARF, denies the claim that he did not want Plaintiff to be a unit representative and states, "In fact, at the time, I would not have been opposed to Mr. Annabel serving as a housing unit representative." *Defendants' Exhibit J,* ¶ 3, Pg ID 2621. Kindinger denies any involvement in the July 22, issuance of the misconduct ticket, asking Frost to issue the ticket, or responding to Plaintiff's grievance. *Id.* at ¶ ¶ 7-8. He states that he would not have learned of the grievance until the Step II response was issued which happened three days after the misconduct ticket was written. *Id.* at ¶ 8.

The allegations of Kindinger's participation in a retaliatory scheme are subject to dismissal. Plaintiff alleges in his amended complaint by that Kindinger stated that he did not want Plaintiff to hold the position of unit representative. However, Plaintiff's deposition testimony, discussed above, stands at odds with his original allegation that Kindinger actually stated that he did not want Plaintiff to be a unit representative. Significantly, Plaintiff's July 17, 2014 Step I grievance does not allege that Kindinger stated that he did not want Plaintiff to be unit representative or had otherwise expressed displeasure with Plaintiff. *Defendants' Exhibit B,* Pg ID 2562. Plaintiff's Step I grievance does not allege that he was singled out for unfair treatment by Kindinger and in fact was rejected on the basis that it was "unclear as to how this issue [of the unit representative election] effects just you [] as it would effect

the entire housing unit." *Id.,* Pg ID 2563.  Although the purported fact that Kindinger voiced

his opposition to Plaintiff's appointment as unit manager would have been pertinent to the

original grievance regarding elections, the claim that Kindinger had declared that he did not

want Plaintiff to be unit representative did not surface until the July 28, 2013  grievance

alleging that the misconduct ticketed had been issued in retaliation for filing the original

grievance. *Defendants' Exhibit G,* Pg ID 2586.

Further, the contention that Kindinger did not want Plaintiff to be unit representative

is undermined by both Frost's and Plaintiff's statements that Kindinger was permitting

Plaintiff to act as an "unofficial" unit representative at the time that Plaintiff requested

elections. *Docket #210,* pg. 34 of 100, Pg ID 2364; pg. 84 of 100, Pg ID 2414.  While

Plaintiff theorized at one point that Kindinger "had an interest in eliminating [him]" as a

candidate for unit representative because of Plaintiff's "reputation" among the prisoners "as

knowing how to address grievances and complaints," *Id.,* pg 44 of 100, Pg ID 2374, he does

not offer an explanation for the fact Kindinger allowed him to act as a unit representative in

an unofficial capacity during the time that Plaintiff was ineligible for the official position.

Setting aside Kindinger's affidavit testimony, the Plaintiff's theory that Kindinger attempted

to prevent Plaintiff from assuming the unit representative position, as set forth in Plaintiff's

testimony, is not supportable.   Plaintiff testified that Kindinger refrained from calling

elections based on the fact that Plaintiff would be the only candidate eligible for the open

position (presumably allowing him to be take the position by default) *Id.,* pg. 34 of 100, Pg

ID 2364.  However, he later testified  that there were two other eligible individuals who ran for the unit representative position against Plaintiff in the August, 2013 election. *Docket #210,* pg 42 of 100, Pg ID 2372.   Assuming Kindinger did not want Plaintiff to be the unit representative, it is unclear why he did not call an election at any time during the six-month period that Plaintiff was ineligible for the position, given that at least two other eligible candidates were eligible for the position.  Notably, during at least part of the time that Plaintiff was ineligible for the position, Kindinger allowed Plaintiff to act as an "unofficial unit representative."

Plaintiff's theory of the retaliatory activity by Kindinger contains additional inconsistencies fatal to the retaliation claim. While Plaintiff appears to allege that the conspiracy to deprive him of the unit representative's position was evidenced by Kindinger's July 1, 2013 statement,  *Amended Complaint* at IV, ¶ 1, he later alleges that Defendants Eaton and Campbell, after denying the Step Two grievance, "notified  . . . Kindinger and [] Frost that Plaintiff had written a grievance and should be disqualified from a unit representative position."  *Id.* at ¶ 5.  While Plaintiff alleged that Kindinger refrained from calling elections because he did not want Plaintiff did be the unit representative (as allegedly demonstrated by Kindinger's initial conversation), he testified at his deposition that Kindinger and other Defendants did not have "personal motive" to retaliate against him, *i.e.* deprive him of the unit representative position until the grievance was filed. *Docket # 210,* 32 of 100, Pg ID 2362.  As discussed above, Plaintiff's theory that Kindinger retaliated

against him is further undermined by Kindinger's statement that he did not know of the original grievance until three days after the misconduct ticket was issued.

Notwithstanding the temporal proximity between the grievance and misconduct ticket, Plaintiff's internally contradictory deposition statements and  inconsistencies with the amended complaint  render the originally "plausible" claims against Kindinger implausible. Conversely, Plaintiff's deposition testimony supports  Kindinger's statement that he had no objection to Plaintiff's election as unit representative at the time of the events in question and was not aware of the grievance regarding the elections until three days after the misconduct ticket was issued.  As such, Kindinger is entitled to judgment as a matter of law.

### 2.  Defendants Frost and McConnell

In regard to Frost, Plaintiff alleges that "Defendants Eaton and Campbell notified Defendants Kindinger and CO Frost that Plaintiff had written a grievance and should be disqualified from a unit representative position." *Amended Complaint* at IV, ¶ 5.  He alleges that the Frost deliberately issued a Class II rather than the less serious Class III misconduct ticket to ensure that Plaintiff was ineligible for the position. *Id.* at ¶¶ 9-12.  Plaintiff's claim that he did not commit the Class II infraction of disobeying a direct order is contradicted by Frost's testimony that he gave Plaintiff "several verbal commands to stop" including a direct command  "Do not touch that food slot" before Plaintiff placed the item in McQuitter's food slot. *Docket #219,* pg 83 of 100, Pg ID 2413; *Defendant's Exhibit C,* Pg ID 2634 at ¶ 8.

As discussed in Section **A,** Plaintiff's theory that Frost lay in wait for him to move out

of range of the security monitors is undermined by the fact that Frost confronted him at the location where Plaintiff admits that he committed a Class III misconduct. Plaintiff's claim that Frost falsified the time of the misconduct is contradicted by McConnell's testimony that Plaintiff was able to have performed the errand at the time stated on the misconduct ticket and that the video evidence did not support Plaintiff's claim that the time was misstated on the misconduct ticket. *Defendant's Exhibit I,* Pg ID 2617.

Plaintiff's account of Frost's allegedly retaliatory activity contains additional inconsistencies. Plaintiff testified that Frost "stealthily followed [him] up on the C wing *away from the other witnesses*," presumably for the purpose of issuing the ramped up ticket out of sight of others. *Docket #210,* pg 38 of 100, Pg ID 2368. However, in direct contradiction to this statement, Plaintiff later testified that three prisoners witnessed the disputed interaction with Frost. *Docket #210,* pg. 39 of 100, Pg ID 2369. Setting aside the inconsistency between Plaintiff's testimony that Frost deliberately confronted him in a location with no witnesses and his later statement that three individuals witnessed the events, he has not presented witness statements by any of the three individuals to support his account. Notably, Plaintiff was found guilty at the ensuing misconduct hearing, and as discussed below, has not shown that hearing officer McConnell had retaliatory motives.

As such, the temporal proximity between the July 17, 2013 grievance (wholly unrelated to Frost) and July 22, 2013 misconduct ticket, without more, does not create a question of fact sufficient to survive summary judgment. While "'the temporal proximity

between filing grievances and the adverse action might provide some circumstantial support for a causal connection,' [we] have been reluctant to find that such evidence without more can demonstrate 'that the filing of grievances was a substantial or motivating factor.'" *Holzemer v. City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010)(*citing Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir.2001))(punctuation altered).   As discussed in greater detail above, Plaintiff's allegation that inmate Tareen Gray received a misconduct ticket from Frost on July 28, 2013, *Amended Complaint* at IV ¶ 16; *Docket #63* at 5, does not support the conclusion that Frost "retaliated" against Gray, given Plaintiff's failure to allege that Gray engaged in any protected activity giving rise to the "adverse action."  *Docket #210,* pg. 37 of 100, Pg ID 2367.  Because Plaintiff has offered no more than speculation that Frost's issuance of the ticket was in retaliation for the grievance, claims again Frost should be dismissed.

The claims against McConnell are also subject to dismissal.  The August 4, 2013 misconduct hearing presided over by McConnell resulted in a finding of guilty.  McConnell testified that "a review of the video monitoring system" did not support Plaintiff's claim that the misconduct occurred approximately two hours after the time stated on the ticket. *Defendant's Exhibit I,* Pg ID 2617.  He testified further that he did not recall any conversation with any of the Defendants in which he stated that he did not want Plaintiff to be a unit representative or that he had "a personal disposition" regarding the issue.  *Id.* at 2618.  While Plaintiff now speculates that McConnell was a party to the retaliatory scheme,

and disputes the outcome of the misconduct hearing, he did not allege at the hearing that the issuance of the misconduct ticket was based on retaliatory animus but instead, waited until appealing the guilty finding to allege retaliation. *Defendants' Exhibit F,* Pg ID 2582-3; *See* MDOC PD 03.03.105. Moreover, Plaintiff failed to name McConnell by either name or position at Step I of July 28, 2013 grievance alleging that the misconduct ticket was issued as part of a retaliatory scheme for the filing of the July 22, 2013 grievance. *Defendants' Exhibit G,* Pg ID 2586, 2588. Thus, as to McConnell's role in the retaliatory activity *outside* that of hearing officer, Plaintiff has not exhausted his administrative remedies. *See* MDOC PD 03.02.130, ¶ R (Step I grievance must include the "[d]ates, times, places, and names of all those involved in the issue being grieved . . ."). *See* Prison Litigation Reform Act ("PLRA") of 1996, 42 U.S.C. § 1997e(a)("[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted").

### 3. Defendants Eaton and Campbell

Plaintiff does not provide any evidentiary support for his belief that Defendant Eaton rejected his grievance at Step I for the purpose of depriving him the unit representative position. Eaton testified that he did not discuss Plaintiff's grievance regarding the unit representative position with any other Defendant. *Defendants' Exhibit D*, ¶ 8, Pg ID 2571. Moreover, the Step I response provides a legitimate reason for rejecting the Step I grievance, stating that it was "unclear as to how this issue [of holding unit representative elections]

-22-

affects just you [] as it would effect the entire housing unit." *Defendants' Exhibit C,* Pg ID

2563.   Deputy Warden Campbell testified that under MDOC policy, an incident "involving

more than two prisoners" would not be addressed through the grievance policy, but rather,

would be handled by kites to the deputy wardens, housing unit supervisors, and the warden.

*Defendants' Exhibit M,* Pg ID 2646-7.   Defendants have provided legitimate, non-retaliatory

reasons for rejecting the grievance.

Campbell also testified that he never told Defendant Kindinger or any other Defendant

that Plaintiff ought to be barred from the position of unit representative.   *Defendants' Exhibit*

*M,* Pg ID 2645.   Plaintiff does not provide any motive for Eaton and Campbell's alleged

direction to Kindinger that Plaintiff be barred from acting as a unit representative.   As

discussed above, neither Eaton nor Campbell can be held liable for the First Amendment

retaliation claim by simply by denying Plaintiff's grievance.   *See Shehee v. Luttrell*, 199 F.3d

295, 300 (6th Cir. 1999)(no liability under § 1983 where Defendants' "only roles . . . involve

the denial of administrative grievances").   While   Campbell also upheld Defendant

McConnell's finding of guilt on the Class II misconduct charge, he provided legitimate, non-

retaliatory reasons for denying the appeal, noting that "no video evidence" supported

Plaintiff's claim that the misconduct ticket misstated the time of the infraction.   *Defendants'*

*Exhibit F,* Pg ID 2583-4.   As to Campbell's denial of Plaintiff's July 28, 2013 grievance

subsequent to the misconduct ticket, Campbell correctly states that the allegations in the

grievance pertaining to the misconduct ticket were "non-grievable." *Id.* at Pg ID 2587.   *See*

*Harris-Bey v. Alcodray*, 2017 WL 3124328, at *4 (E.D.Mich. July 24, 2017)(Lawson, J.)(*citing Siggers v. Campbell*, 652 F.3d 681, 694 (6th Cir. 2011))(appeal of misconduct hearing determination as as set forth in MDOC PD 03.03.105, and not the grievance procedure, is "sole avenue" for challenging guilty findings). Again, Campbell denies that he told others to bar Plaintiff from the position of unit representative or had any personal involvement in the allegedly retaliatory issuance of a Class II misconduct ticket.

In conclusion, Plaintiff's original factual allegations "fleshed out" by his lengthy deposition testimony, are self-contradictory; unsupported by evidence (even where witness statements would have purportedly supported his claim); and Defendants have provided legitimate, non-retaliatory reasons for their actions. As such, Defendants are entitled to judgment as a matter of law.

Independent of the above analysis and conclusion, Plaintiff's claim that the temporal proximately of the grievances to the misconduct ticket allows him to survive summary judgment is undermined by the fact that the two grievances at issue in this case were only two of 20 that he filed in the calender year of 2013. *Docket #15-10,* Pg ID 177-181. Plaintiff testified at his September 27, 2017 deposition that he incurred "approximately 300" misconduct tickets in his 14-year tenure with the MDOC, for an average of more than 21 misconduct tickets each year.[4] *Docket #210,* Pg ID 2376. Given that Plaintiff averaged

---

[4]Plaintiff does not state which percentage of the misconducts were for Class I or II offenses.

-24-

between one and two misconduct tickets and grievances every month, the "close temporal

proximity" between the grievance and misconduct ticket in this case is of lessened import:

> Plaintiff merely alleges the ultimate fact of retaliation. He alleges no facts
> from which to reasonably infer that Defendant's actions were motivated by his
> protected conduct. He merely concludes that because he filed grievances
> sometime prior to Defendant's actions, the misconduct ticket must have been
> motivated by those grievances. The Sixth Circuit, however, has been reluctant
> to find that temporal proximity between the filing of a grievance and an
> official's adverse conduct, standing alone, is sufficient to establish a retaliation
> claim. *Hill v. Lappin*, 630 F.3d 468, 476 (6th Cir. 2010). This is especially true
> where, as here, the plaintiff is a prolific filer of grievances. *Coleman v.
> Bowerman*, 474 F. App'x 435, 437 (6th Cir. 2012)(holding that temporal
> proximity to the filing of a grievance is insufficient because any adverse action
> "would likely be in 'close temporal proximity' to one of [the plaintiff's] many
> grievances or grievance interviews"). Plaintiff apparently rests his retaliation
> claim on the fact that he filed a grievance before he received the misconduct
> ticket. These allegations are insufficient to support a retaliation claim.

*Dahlstrom v. Butler*, 2019 WL 91999, at *14 (W.D.Mich. January 3, 2019).  Where a

prisoner is both a "prolific filer of grievances" and a frequent recipient of misconduct tickets,

there would almost always be a temporal proximity between one event and the other. Again,

while  independent grounds exist for granting Defendants' motion, the inference of

retaliation based on temporal proximity (and nothing more) is weakened by both Plaintiff's

frequent filing of grievances and his receipt of misconduct tickets.

## VI.    CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment

[Doc. #211] be GRANTED and that Plaintiff's Motion for Summary Judgment [Doc. #210]

be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: August 9, 2019